UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

      - v. -                    :          12 Cr. 576 (JPO)

DAVID HAUSMAN,                    :

               Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America


Janis Echenberg
Assistant United States Attorney

Richard Udell
Senior Trial Attorney
Environmental Crimes Section, ENRD
U.S. Department of Justice

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                                    :

       - v. -                                             :          12 Cr. 576 (JPO)

DAVID HAUSMAN,                                              :

                Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

The Government, by and through the attorneys below, respectfully submits this memorandum in connection with the sentencing of defendant David Hausman ("Hausman" or the "defendant"), which is scheduled for February 14, 2012, at 4 p.m. In its Presentence Investigation Report ("PSR"), the United States Probation Department ("Probation Department") correctly calculates that the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range is 18 to 24 months' imprisonment.

Over the course of at least fourteen months, Hausman repeatedly and brazenly took advantage of his position of trust as a Government informant -- violating federal wildlife trafficking laws while making a concerted effort to distract United States Fish and Wildlife Service agents from focusing on his illegal activities. And even when he got caught, he sought to obstruct justice and continued to lie and deceive federal agents about the illegally obtained rhinoceros horns in his possession.

-1-

Hausman seeks a non-custodial sentence based on claims regarding his health and family circumstances as well as good works in the community. None of these claims merit a departure from the Guidelines range in this case. For the reasons set forth in more detail below, given the nature and circumstances of Hausman's crimes, most particularly the numerous and calculated deceptive acts he engaged in to mislead federal law enforcement agents, his history and characteristics, and the great need in this case to promote respect for the law and ensure just punishment, the Government believes that a sentence within the applicable Guidelines range of 18-24 months is warranted here.

## BACKGROUND

### A.   Rhinoceros Trafficking

Since 1976, trade in rhinoceros horn has been regulated under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), a treaty signed by over 170 countries around the world to protect fish, wildlife, and plants that are or may become imperiled due to the demands of international markets. Nevertheless, the demand for rhinoceros horn and black market prices for it have skyrocketed in recent years due to the value which some cultures have placed on ornamental carvings, good luck charms or alleged medicinal purposes, leading to a decimation of the global rhinoceros population. (PSR ¶ 8).

The increasing demand for rhinoceros horn has led to an exponential increase in the poaching of rhinoceros for their horn. For the Court's reference on the plight of the rhinoceros, attached as Exhibit A are articles, from Time Magazine and National Geographic, as well as data compiled by the Ministry of the Environment in South Africa and Traffic, a non-profit wildlife

-2-

trade monitoring network. As the Time article explains, after years of successful conservation

efforts, over the past few years:

> the news from Africa has turned dire. Poaching, once restrained, has
> skyrocketed. From 2000 to 2007, only about a dozen rhinos were poached
> each year in South Africa, where nearly 90% of all rhinos live, according
> to the WWF. But last year (2010), 333 were illegally slaughtered there,
> nearly all found with their horns chopped off… Today's illicit rhino-horn
> trade isn't just small-time poachers picking off a stray beast or two.
> Instead, law enforcement officials say, global crime syndicates are
> orchestrating the lucrative business. By weight, rhino horn can be worth
> more than gold, fetching tens of thousands of dollars a kilogram in China
> or Vietnam.

*Killing Fields*, by Hannah Beech/Beijing and Handi and Alex Perry/Pilanseberg, Time

Magazine, June 13, 2011, pp. 42-43. The Ministry of the Environment in South Africa reports

that 668 rhinos were poached in South Africa in 2012 and 82 rhinos have been poached since the

start of 2013, 61 in Kruger National Park. *Update on the Rhino Poaching Statistics*, The

Ministry of the Environment in South Africa, February 6, 2013. As reported in a recent Interpol

briefing (also attached in Exhibit A), because trade in rhinoceros horn has become so lucrative,

an organized crime group in Ireland is now engage in theft and illegal trade of horns, often

acquiring horns from antique dealers like Hausman, as well as private collectors and museums,

sometimes even by force.

In response to the significant threat to the rhinoceros population, the Department of the

Interior's Fish and Wildlife Service ("FWS") initiated "Operation Crash," a continuing

investigation to detect, deter and prosecute those engaged in the illegal killing of rhinoceros and

the unlawful trafficking of rhinoceros horns. (A "crash" is the term for a herd of rhinoceros.)

The investigation is being led by the Special Investigations Unit of the FWS Office of Law

Enforcement and involves a nationwide task force of agents focused on rhinoceros trafficking,

-3-

including agents from the U.S. Department of Homeland Security's Homeland Security Investigations. (PSR ¶ 10). To date, thirteen individuals have been arrested in connection with Operation Crash. The charges range from Lacey Act Trafficking to Bribery, encompassing defendants who sell and transport raw horns as well as those who illegally trade, export and smuggle items carved from rhinoceros horn. Hausman is the first of these Operation Crash defendants to be sentenced.

## B.  Hausman's Wildlife Trafficking and Repeated Obstruction of Justice

### 1.  Hausman Poses As A Good-Samaritan Informant for FWS

Since in or around 1981, Hausman has been a self-employed art and antiques dealer, working from his home in Manhattan. (PSR ¶ 73). In or around August 2009, Hausman approached the Department of Interior, United States Fish & Wildlife Service ("FWS") to report illegal activity he had observed, namely that recently-made items containing rhinoceros horn were being sold as antique items, and Hausman offered his expertise on this subject to FWS. Between August 2009 and his arrest on February 18, 2012, Hausman voluntarily provided information on the illegal acts of others to FWS and assisted the FWS with the analysis of certain items, while – unbeknownst to FWS – he was attempting to learn of FWS's investigative activities and engaging in illegal rhinoceros horn trafficking himself. On or about March 23, 2011, Hausman signed an agreement with FWS through which he agreed to continue to provide information about illegal activity ("the Agreement"). The terms of the Agreement required, among other things, that Hausman (i) not initiate any illegal activity without prior authorization from USFWS; (ii) report to USFWS all conversations regarding the rhinoceros trade; and (iii) not knowingly engage in witness tampering, witness intimidation, entrapment, or the fabrication,

-4-

alteration, or destruction of evidence or induce any individual to commit a crime that he or she has no predisposition to commit. (PSR ¶ 11).

2.    Hausman Covertly Purchases Two Rhinoceros Horns After Advising FWS Of Their Being Offered Illegally For Sale

In or about December 2010, while purporting to help the Government crack down on illegal rhinoceros trading, as described above, Hausman advised FWS that the taxidermied head of a Black Rhinoceros containing two horns ("Mount-1")[1] had been illegally sold by a Pennsylvania auction house. Then, in March 2011, upon learning that the sale was not finalized, Hausman covertly purchased Mount-1 himself, using a friend who resided in Pennsylvania as a "straw buyer." Hausman paid the straw buyer approximately $2,000 to procure Mount-1 without disclosing that Hausman was the true purchaser because Hausman knew that federal law prohibits interstate trafficking in endangered species such as Black Rhinoceros. Hausman instructed the straw buyer not to communicate with him about the matter by email as to avoid creating a paper trail that could be followed by law enforcement. After the purchase was consummated, Hausman directed the straw buyer to remove the horns and mail them to him in New York.

Hausman then took an additional step, the significance of which cannot be overstated. He manufactured a realistic set of fake horns using synthetic materials.[2] The fake horns were cast from the real horns. He then mailed them to the straw buyer and directed her to attach them on the rhinoceros head in order to deceive law enforcement in the event that they conducted an investigation and asked to see the mount. Absent close examination of the base, the fake horns are difficult to tell apart from the real ones. Then, after his arrest in February 2012, Hausman

---

[1]    A photograph of Mount-1 is attached as Exhibit B.
[2]    A photograph of the synthetic horns is attached as Exhibit C.

-5-

contacted the straw buyer to see if she still had the mount and they agreed that it should be burned or concealed. (PSR ¶¶ 12-14).

### 3. Hausman Makes An Illegal Rhinoceros Horn Purchase From An Undercover Agent While Continuing to Purport to Assist FWS

In September 2011, Hausman responded to an internet offer to sell a (different) taxidermied head of a Black Rhinoceros containing two horns ("Mount-2").[3] Unbeknownst to Hausman, the on-line seller was an undercover federal agent ("UC-1"). Before purchasing the horns, Hausman directed the undercover agent to send him an email falsely stating that the mounted rhinoceros was over 100 years old, even though the agent had told Hausman that the rhinoceros mount was only 20 to 30 years old. As Hausman knew, there is an antique exception for certain trade in rhinoceros horns that are over 100 years old. Also on or about October 10, 2011, at UC-1's request, Hausman sent UC-1 a $2,000 check. Hausman and UC-1 agreed that the check would be returned at the time of the sale so there would be no written record of the cash transaction. Hausman promised that, once the check was returned, he would destroy it. (PSR ¶ 15).

On or about November 15, 2011, after traveling from his home in Manhattan, Hausman purchased Mount-2 from another FWS agent posing as a relative of UC-1 ("UC-2"). The transaction took place at a truck stop in Princeton, Illinois. Hausman paid $8,500 cash for Mount-2. At Hausman's direction, UC-2 signed a receipt, prepared by Hausman, falsely stating that Agent-2 was transferring "title of ownership to one rhino taxidermy mount over one hundred years old" to Hausman (the "Receipt"). (PSR ¶ 16).

---

[3]     A photograph of Mount-2 is attached as Exhibit D.

By creating false records, Hausman sought to conceal his illegal conduct. Hausman also insisted on a cash transaction and told the undercover agent not to send additional emails so there would be no written record. After Hausman bought Mount-1, agents followed him and observed him sawing off the horns in a motel parking lot. The horns were found in his apartment during a search of his home on February 18, 2012. (Id.)

On or about February 12, 2012, during a recorded conversation with UC-1 (who Hausman did not yet know was an undercover FWS agent) Hausman lied again, stating he left the mount with a restorer in Chicago and that this restorer sold the mount to a customer on Hausman's behalf. Hausman further informed UC-1 that rhinoceros are being poached for their horns, which are sent to the Far East for medicine and stated his awareness that "the Fish and Wildlife people are all over those things." He also recounted how his friend had a rhinoceros mount seized by FWS officials. Despite this explicit knowledge, and numerous meetings and communications with agents conducting criminal investigations, Hausman was undeterred. During this call, Hausman further informed UC-1 that Hausman could offer at least $1,000 as a finder's fee, and potentially more, if UC-1 provided another rhinoceros mount.

At no time between March 23, 2011 and Hausman's arrest on February 18, 2012 did Hausman inform anyone at FWS of the Mount-2 transaction or any of the correspondence with UC-1.

4.    Hausman Misleads Agents Again During the Search of His Home

On or about February 18, 2012, FWS agents searched Hausman's Manhattan apartment pursuant to a search warrant. During the search, FWS agents found and seized four Black Rhinoceros mounts, three of which did not have horns and one of which had fake resin horns

-7-

attached. No horns matching these mounts were found in Hausman's apartment. Agents found three sets of Black Rhinoceros horns (six horns), including the two horns from Mount-2, as well as several items carved from Rhinoceros horn, including items that appeared to be in the process of being carved, as well as tools for making such carvings.[4] (PSR ¶ 17).

When voluntarily interviewed by FWS agents during the search, Hausman initially stated he was working with FWS. He tried to use his inside connection with the FWS to his advantage. He also stated that he had documents to prove that the horns from Mount-2 were more than 100 years old. The defendant then used the document he knowingly crafted to be fraudulent for the purpose it was intended. When faced with law enforcement agents, Hausman provided them with the false Receipt. Hausman also falsely stated that he had not written a check as a deposit for Mount-2. (PSR ¶ 18).

During the search, Hausman identified one set of horns as being from Mount-1. Upon further inspection later by the investigative agents, including comparison to photos of Mount-1 provided by the Pennsylvania auction house, agents determined that the horns Hausman identified as being from Mount-1 were not actually from that mount. When Hausman was confronted (through his attorneys) about this additional false statement, he agreed to, and did, turn over the actual horns from Mount-1 at the time of his guilty plea. Why would Hausman lie about these horns? Perhaps because it would offer an explanation for the horns found in his apartment and stop the agents from looking further for the Mount-1 horns. Agents did investigate another set of horns found in his apartment that he claimed had been purchased from a dealer in Florida. That dealer was contacted and denied any such transaction. Hausman, who

---

[4]     Photographs of the items seized are attached as Exhibit E.

appears to have been obsessed by having records to prove legality, had no such records for this set of horns.

As agreed by the parties, the total market value of the horns at issue in this case is between $70,000 and $200,000.  (PSR ¶ 19).

5.      Additional Uncharged Conduct

In the course of the Government's investigation, agents obtained an email (attached as Exhibit F) which relates to a rhinoceros horn cup found in Hausman's apartment during the search. The email shows that Hausman made the purchase without any due diligence. Then, as set forth in the email, on or about March 31, 2010, Hausman is explicitly advised that an antique he just purchased was illegally imported in to the United States. Hausman purchased this cup during the time that he was purportedly assisting FWS in cracking down on such conduct.

The Government's investigation also revealed that Hausman had made and was making new rhinoceros horn libation cups – the very crime that he reported to the Government. According to one witness, Hausman made a carving and attempted to sell it to an auction house but the auction house was not interested because they determined it was a fake. It is not known what happened to this carving since it was not found in the search of his apartment. One of the forfeited objects from Hausman's apartment is a partially finished rhinoceros horn libation cup that it appears he was carving at the time of his arrest. Also found at his home was a book detailing how to carve libation cups.

Although the Government did not charge this additional conduct, and does not argue that it should be considered in calculating the defendant's Guideline's range, the Government highlights it here simply to rebut defense counsel's argument that Hausman's conduct was "out

of character" and that is he "less culpable" than other wildlife trafficking defendants. (Def. Memo. at 20-21). Hausman is actually more culpable than most other wildlife traffickers because his violations were willful and deliberately designed to thwart law enforcement and benefit from the position of trust that he had obtained with federal agents.

**B.      The Complaint, Hausman's Guilty Plea, and the Guidelines Calculation**

On February 17, 2012, Hausman was charged in a two-count Complaint with Lacey Act trafficking and false records, in violation of Title 16, United States Code, Sections 3372(a)(1) and 3373(d)(1)(B) and (d)(3)(A) and Title 18, United States Code Section 2, and 1343, respectively. On July 31, 2012, pursuant to a plea agreement, Hausman pled guilty to the two-count Information in this case, which charges him with obstruction of justice, in violation of Title 18, United States Code Section 1519 and 2 and Lacey Act false record, in violation of Title 16, United States Code, Sections 3372(d)(2) and 3373(d)(3)(A).

The Probation Department has correctly calculated the defendant's Offense Level and Criminal History Category under the Guidelines, resulting in an Adjusted Total Offense Level of 15 and a Criminal History Category of I. This results in a Guidelines range of 18 to 24 months' imprisonment and a fine range of $4,000 to $40,000, which is consistent with the parties' calculation in the plea agreement. (PSR ¶ 87). The Probation Department recommends a sentence of time served (however, the defendant has not spent any time in jail on these charges), to be followed by one year of supervised release and 100 hours of community service, a fine of $4,000 and forfeiture of $28,000. (Sentencing Recommendation at 25). In the Government's view, the Probation Department's proposed sentence does not adequately account for the

seriousness of the wildlife offenses, the seriousness of the obstruction and related conduct, or the need for both general and specific deterrence.

## ARGUMENT

A Guidelines sentence is warranted in this case. At its core, this is a case about obstruction of justice. It is a case about a voluntary informant who double crossed law enforcement and repeatedly abused a position of trust he held with federal agents in order to engage in repeated violations of laws that protect a severely endangered species. Hausman obstructed justice despite having the highest possible level of knowledge about the illegality of his actions. Moreover, Hausman continued to obstruct justice even after he was arrested. Contrary to his claim that his efforts to assist federal agents were generally "well-meaning" (Def. Memo. at 17), Hausman repeatedly reached out to FWS immediately after speaking to the undercover agent regarding his purchase of Mount-2, in an transparent effort to scope out whether his activities were being monitored. Hausman also engaged in witness tampering and post-arrest concealment of evidence – crimes that undermine the very integrity of our judicial system.

This is also a criminal wildlife trafficking case in which the defendant's conduct deliberately violated the regime designed to protect one of the last remaining mega fauna from extermination. Hausman's duplicity is that he claimed to be concerned about a species and then himself promoted the very trade he had pledged to help stop. Criminal violations of wildlife statutes harm the public and our natural resources. They create demand and a market for the exploitation of endangered species such as the black rhinoceros. Hausman argues that because he used rhinoceros horn in the fine arts business rather than to grind it up for alleged medicinal

-11-

purposes, he is somehow less culpable. (Def. Memo at 16). As Hausman himself reported to FWS agent, the sale of newly carved rhinoceros horns -- presented as antiques -- has become a lucrative business. And the Operation Crash investigation has determined the same thing – the increasing demand for rhinoceros horn is twofold: alleged medicinal uses and rhinoceros carving, both of which result in poaching of rhinoceros. Unfortunately, these crimes are difficult to detect and the defendant's numerous violations were only uncovered as a result of a pro-active investigation. Consequently, adequate deterrence is essential. This is especially true when the violations were intentional, repetitive, involved concealment and obstruction, and were committed by the Government's own informant.

Many defendants have family or have done something for others, and most 67 year old defendants have health issues. These factors are not unusual to this defendant. But not every defendant is an educated and self-aware person with a prior criminal history who deliberately committed a crime while working with law enforcement, thus making him uniquely aware of the consequences of his criminal conduct both prior to and at the very time he was committing crimes. In this way, Hausman is an outlier, an adverse variant from the ordinary defendant. He knew the precise risk he was taking when he committed this crime, the serious interest of the United States in this activity, and the potential consequences were no surprise to him. He did not act on impulse or by mistake. He thought it through, and apparently intended some financial advantage to himself. Ironically, the defendant's sentencing submission now minimizes his culpability and seeks a sentence outside of the sentencing Guidelines because he now claims to be sorry and because he was trying to make money from rhinoceros horn in a slightly different

-12-

way than others. The impact on the limited resource of rhinoceros horn is the same whether it's being sold to promote a market in medicine or mantelpiece items.

The criminal conduct engaged in by the defendant is serious for many reasons including the following:

- Deliberate intent to violate the law;

- Numerous and repetitive violations of the law;

- Financial motive combined with a complete disregard for the impact on species that the defendant knew to be in peril;

- Complete subversion of his confidential agreement to assist the Government;

- Acts of concealment, including directing others not to create a paper trail, fabricating false documents and false rhinoceros horns prepared in advance to avoid suspicion, avoid culpability and protect against conviction;

Hausman's criminal conduct did not involve a solitary violation or mistake that might be explained as a single instance of bad judgment. Rather, the violations at issue in this case were so systemic, repetitive and demonstrative of his consciousness of guilt that it demonstrates beyond any doubt that he is nothing more or less than an ordinary criminal.

For these reasons, as well as for the importance of deterrence, promoting respect for the law, and providing just punishment in this case, the Government respectfully submits that a sentence within the Guidelines range of 18 to 24 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

## I.    Applicable Law

Although they are no longer mandatory, the Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*,

-13-

397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007). As the Second Circuit has remarked *en banc*, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 128 S. Ct. at 594; *see also Rita*, 127 S. Ct. at 2464.

After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

-14-

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 128 S. Ct. at 596).

## II.     The Nature and Circumstances of this Offense Warrant a Sentence of Imprisonment

Hausman's repeated efforts to manipulate and deceive law enforcement, and to circumvent laws he knew to be in place to protect a nearly extinct species weigh heavily in favor of a Guidelines sentence. Hausman's description of his offense conduct as merely the purchase of four horns, and covering up these purchase from the Government (Def. Memo at 15), significantly minimizes his role. Hausman used his position as a Government informant to remain apprised of FWS's activities so that he could feel secure in his own illegal activities. In 2010, he brazenly purchased a mount he has just told FWS was being illegally offered for sale. And then, just months after signing an agreement where he agreed (i) to not initiate any illegal activity without prior authorization from FWS and (ii) to report to FWS all conversations regarding the rhinoceros trade, he engaged, on-line and by phone, with a stranger (who turned out to be an undercover FWS agent) to illegally purchase another mount. He did so without

-15-

informing his primary FWS contact, or anyone else at FWS, of what he was doing. He also checked in with his FWS contact several times, almost immediately after speaking with the undercover agent, in an apparent effort to determine whether FWS had any idea of what he was doing.

Hausman's agreement with FWS also required that he not knowingly engage in witness tampering, witness intimidation, entrapment, or the fabrication, alteration, or destruction of evidence. Instead, he did just the opposite, contacting the straw buyer after his arrest and agreeing with her that the rhinoceros mount should be burned or concealed.

In addition, by deceiving agents about his activities, Hausman potentially compromised other ongoing investigations. And, he had several additional horns and rhinoceros horn cups in his home, several of which are, at best, of questionable origin and which he has forfeited as part of the plea agreement.

These are not the acts of a misguided conservationist. These are the acts of a calculated manipulator of the law and law enforcement.

## III.    Hausman's History and Characteristics Also Support a Prison Sentence in This Case

Hausman's history and characteristics also suggest that a Guidelines sentence is warranted in this case. Although he has no criminal history points, this is not Hausman's first brush with the law. In his twenties, Hausman was arrested in connection with multiple burglaries as well as illegal narcotics possession. (Def. Memo at 7; PSR ¶ 42). In connection with one of burglaries, he was sentenced to three years' imprisonment, but served only six months before being granted a pardon for good behavior. (PSR ¶¶ 38-39). Despite being given a clean slate, and full restoration of his civil rights, Hausman chose to break the law again, several

-16-

times, before being caught once again. Instead of appreciating the break he was given by the Government and leading a law-abiding life going forward, he used his knowledge of wildlife protection laws and his unique relationship of trust with law enforcement to repeatedly break the law.

The defendant also argues that his personal and family circumstances justify a non-jail sentence. Specifically, the defendant says he would lose his rent-stabilized apartment, and would unable able to visit his elderly mother and grandchildren who live out of state. (Def. Memo at 19). Section 5H1.6 of the Sentencing Guidelines provides that "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. Accordingly, because family circumstances are a "discouraged" basis for departure under the Sentencing Guidelines, a court may depart downward based on such circumstances "only 'in exceptional cases,'" *Koon v. United States*, 518 U.S. 81, 95 (1996) (quoting U.S.S.G. ch. 5, part H, intro. comment.), and "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Id.* at 96; *see also United States v. Walker*, 191 F.3d 326, 338 (2d Cir. 1999) (family circumstances departures "must be reserved for situations that are truly extraordinary"); *United States v. Faria*, 161 F.3d 761, 762 (2d Cir. 1998) ("a court may depart on the basis of family circumstances only in exceptional circumstances").

The Second Circuit has repeatedly emphasized that "[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992); accord

-17-

*United States v. Galante*, 111 F.3d 1029, 1034 (2d Cir. 1997); *United States v. Londono*, 76 F.3d 33, 35 (2d Cir. 1996). Accordingly, the Second Circuit has limited family circumstances departures to extraordinary situations "where the family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments," which is not the case here. *United States v. Faria*, 161 F.3d at 762 (quoting *United States v. Sprei*, 145 F.3d 528, 535 (2d Cir. 1998)). By contrast, where other adults are available to provide emotional or financial support or other care to the defendant's family members, the Second Circuit has found departures on those facts to be abuses of the district court's discretion. *See, e.g.*, *United States v. Madrigal*, 331 F.3d 258, 260 (2d Cir. 2003) (noting that "the common collateral damage of imprisonment" suffered by a family where a parent with young children and elderly parents is incarcerated is simply not sufficient to justify a departure); *United States v. Smith*, 331 F.3d 292, 293 (2d Cir. 2003) (same).

## IV.     The Need to Promote Respect for the Law, to Ensure Just Punishment,and for Deterrence in This Case

There is a critical need in this case to promote respect for the law and ensure just punishment. Such blatant and deliberate obstruction of law enforcement should not be met with a mere slap in the wrist. In addition, as is set forth above, the worldwide rhinoceros population, in particular the Black Rhinoceros, is near extinction. The illegal trade of rhinoceros horn engaged in by Hausman exacerbates the threat to this animal. Significant law enforcement resources have been dedicated to Operation Crash (and other law enforcement efforts worldwide) to stem the tide of the decimation of the rhinoceros population. The investigation has revealed that the illegal trade of rhinoceros horn is rampant in the United States and the demand created

-18-

has increased prices and jeopardized the future of a species. Accordingly, a Guidelines sentence of incarceration in this case would have an important specific and general deterrent effect.

## V.    A Sentence of Incarceration Would Not Result in An Unwarranted Sentencing Disparity

The defendant argues that Hausman should not be sent to jail because his conduct is "out of the ordinary" and not as serious as other Operation Crash defendants. (Def. Memo at 20). First and foremost, the defendant is convicted of obstruction of justice. He has admitted that each and every statement in the Information is true and correct. Those allegations to which he has admitted include preparing a false email and false receipt, using that receipt to deceive law enforcement, and agreeing with the straw buyer to destroy or conceal Mount-1. Few, if any, defendants convicted of pollution and wildlife crimes did what Hausman did --- commit crimes and gain advantage while signed up as a cooperating informant. It would be hard to find any defendant that had a higher degree of criminal intent – specific intent to break the law. His guilty mind is particularly evident in the numerous steps he took to try and conceal his crimes before and after he was caught. He is someone who basically thought he could game the system. It is simply not true that incarcerating this defendant as provided for under the federal sentencing guidelines would create a sentencing disparity. However, it may well be true that not providing for any sentence of incarceration would create a sentencing disparity.

The plea agreement sets forth the parties' agreement regarding the applicability of two separate guideline calculations. Pursuant to the environmental/wildlife guidelines, the parties agreed that the applicable total offense level was 18 pursuant to 2Q2.1. Accounting for acceptance of responsibility, the adjusted offense level is 15. However, it is instructive that the plea agreement also sets forth the agreement of the parties, pursuant to the obstruction

guidelines, which result in a total offense level of 16 (base level of 14 and an additional 2 levels because the offense was extensive in scope, planning and preparation, 2J1.2(b)(3)). Since both guidelines apply, the higher guideline was used pursuant to 3D1.3(a). On all of this, the parties agreed. The Probation Office states, without much analysis, that a variance is warranted from the total offense level of 15 and asserts that a sentence of probation will achieve the Title 18 goals of punishment and deterrence. The Government strongly disagrees. Neither the Probation Office nor the defendant address the obstruction guidelines specifically. This defendant was not deterred despite his intimate knowledge of the law and the possibility of enforcement. Even if he were sentenced on the lower of the two applicable guidelines, a term of incarceration of 15 to 21 months would apply under an adjusted offense level of 14, (total offense level 16, minus 2 for acceptance of responsibility).

Jail sentences are routine in false statements and obstruction of justice cases. For example, in this court, an FBI agent was sentenced to a year and a day for false statements relating to signing up a confidential informant and leaking of FBI reports. *United States v. Busby*, 11 Cr. 370 (HB). Similarly, in *United States v. White*, 10 Cr. 516 (SHS), the defendant was sentenced to 41 months for fraud, false statements and witness tampering in a case where the defendant claimed to be a veteran in order to obtain VA contracts and then lied to investigators and tried to get an employee to lie as well. In addition, in *United States v. Jahedi,* 09 Cr. 460 (SAS), the defendant was sentenced to three months' imprisonment upon a guilty plea to obstruction of justice after he shredded documents responsive to a subpoena.

-20-

Furthermore, the defendant's own reference to the U.S. Sentencing Commission statistic that 70.4 percent of individuals convicted of pollution and wildlife offenses received a non-prison sentence in 2011, means that 29.8 received some period of incarceration. Accordingly, a sentence of incarceration would not work any sentencing disparity in this case. *See, e.g., United States v. Gonzalez*, No. 1:11-CR-20868 (S.D. Fla.) (defendant sentenced to 21 months for false statements and obstruction for falsifying ship safety certificates); *United States v. Jose Silva*, No. 1:05-CR-10011 (D. Mass.) (18 month sentence in guilty plea to Lacey Act violations and false statement related to illegal harvesting of lobsters); *United States v. James Holden et al.*, No. 1:05-CR-00011 (M.D. Tenn.) (defendants sentenced to 24 months and 32 months for making false statements and obstructing justice for falsifying water quality test reports and instructing an employee to alter documents to make it appear that the tests had been performed); *United States v. Chang-Sig O* (defendant sentenced to 5 months for falsifying a ship's log book concealing overboard discharges and lying to Coast Guard inspectors); *United States v. De Molina*, No.1:11-CR-20808 (S.D. Fla.) (20 month sentence for Lacey Act and smuggling violations involving smuggled animal parts for taxidermy pieces); *United States v. Smith*, No. 1:11-CR-00004 (D. Alaska) (6 month sentence for selling 2 otter pelts to an undercover officer in violation of the Lacey Act); *United States v. Blyth, et al.*, No. 1:10-CR-00011 (S.D. Ala.) (33, 24, and 13 month sentences for Lacey Act and smuggling mislabeled seafood); *United States v. Place, et al.*, Nos. 1:08-CR-10098 and 1:09-CR-10152 (D. Mass.) (33 and 9 month sentences for Lacey Act trafficking of sperm whale teeth and narwhal tusks).

The government's view is that a sentence that does not involve some period of incarceration would be inconsistent with the crimes (both wildlife and obstruction) committed by this defendant.

## VI. A Fine and Forfeiture

In connection with the defendant's plea, the parties agreed that the $28,000 in United States currency seized from the defendant's apartment on or about February 18, 2012 (the "Seized $28,000") will be available to pay any criminal fine determined by the Court. The parties further agreed that, pursuant to Title 16, U.S.C. §§ 1861(e) and 3375(d), any fine imposed in relation to Count Two be payable to the Lacey Act Reward Fund, administered by the U.S. Fish and Wildlife Service ("USFWS"). To the extent that the defendant is sentenced to no fine, or to a fine less than $28,000, the parties agree that, pursuant to Title 16, U.S.C. § 5305, the remaining sum will be directed to the Rhino Tiger Conservation Fund administered by USFWS for the purpose of Rhinoceros preservation and conservation. Accordingly, the Government respectfully requests that the Court order a fine and/or payment to the Rhino Tiger Conservation Fund as set forth above.

## VI.     Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence within the

Guidelines range of 18 to 24  months is sufficient, but not greater than necessary, to meet the

goals of Section 3553(a).

Respectfully Submitted,

IGNACIA S. MORENO                                     PREET BHARARA
Assistant Attorney General                              United States Attorney
Environment & Natural Resources Division
U.S. Department of Justice

By: Richard Udell                                           By:

Richard A. Udell                                                  Janis M. Echenberg
Senior Trial Attorney                                             Assistant United States Attorney
Environmental Crimes Section                                 (212) 637-2597
(202) 305-0361

-23-